Good morning, your honors. My name is Robert Gombiner and I represent Pauline Anderson. I'd like to reserve two minutes for rebuttal. Pauline Anderson didn't get a fair trial. The government introduced a staggering amount of lavish living evidence. That evidence was inflammatory and prejudicial and it didn't have any relevance. The prosecutors also made repeated appeals to class prejudice. They reminded the jurors over and over again that the defendants, quote, lived a lifestyle you can only dream of. And this all happened in a trial where the evidence against my client was very weak. Even counsel, we agree with you that the prosecutor at times clearly stepped over the line, particularly in argument. There wasn't an objection. So now we're left with plain error review for almost all of the errors that you're raising on appeal. Robert Gombiner I agree with that, your honor. It is a plain error review standard, but I think we easily pass the test for plain error review. Because the error occurred, it was plain. It certainly affected the integrity of the court system. It undermines the integrity of the court system. And it affected the substantial rights of my client because... Pauline Anderson Did you argue in your opening brief about how each of these errors affected her substantial rights? How she was actually prejudiced by these errors given the other evidence against her? Robert Gombiner Yes. My opening brief outlined right at the beginning how weak the evidence against her was. It wasn't a very long... I think it occupies about six pages. But the reason was that 95% if not more of the case had nothing to do with my client. It instead involved these incredibly obscure real estate deals that also had very little to do with Mr. Bontrager. But the evidence against my client essentially came down to they found a bag, a men's bag, that had some documents belonging to both Mr. Anderson and Ms. Bontrager. They found it in 2011. According to the government, that is overwhelming evidence that my client knew about Mr. Bontrager's restitution. What else did they have? They had a statement from Zaba Kiss that Ms. Anderson said at one point when asked why the condominium was in her name that it's better for us. Mr. Kiss specifically said, I don't know what she meant by that. The government claimed that that was an admission of guilt by her. They knew that she had gone to see a lawyer when she met Mr. Bontrager. Without any evidence whatsoever, the government claimed that that meant that the lawyer told her that Mr. Bontrager owed restitution. Basically, if you get down to it, the case against Ms. Anderson was based almost purely on speculation and inference. And that's why we meet the plain error test. I'm looking at page 30 to 31 of your brief where you talk with the end of your section on the wealth references. And you don't say, I mean, there's one paragraph and it doesn't analyze the evidence against her or how, I mean, I'm having trouble figuring out whether you've actually preserved this argument that you're now making. Your Honor, what I would say about that is that I think I spent a great deal of time pointing out why this evidence was prejudicial. Now, it's true. It's not the kind of, I mean, it would be impossible, I submit, to say on a one-to-one basis why all this evidence prejudiced her in any specific way. But the cases don't require you to do that. I think what the cases require you to do is, and I think we did this, and I mean, I thought I spent a lot of time doing this, showing the way they incited this class warfare, this envy, this prejudice. Those are the kind of things that inevitably prejudice the defendant. Well, when you say inevitably, that suggests that it always is the case. And what I'm having trouble with is finding, instead of a one-on-one, where you argue how these alleged errors affected the balance of the evidence so that we can determine whether there was prejudice in light of all the evidence. Well, what I think my brief did, and I think what the record shows, is that I showed how little evidence there was. And I showed how the defendant, Ms. Anderson, was the subject of this relentless, you know, attack and ridicule, basically. I mean, saying she has more shoes than Imelda Marcos. Now, the problem is, of course, this is what I was trying to, and I think I spent a great deal of time on this, the evidence simply had no relevance to any of the issues in the case. So it's not something... That's not right. I mean, she was accused of tax fraud and tax evasion, and she had more money than she was reporting. So how she lived showed how much money she had and how much she was spending, right? How can you say it's not relevant at all? Well, here's why it's not relevant. Because there was no dispute about how the money was made. Mr. Bontrager made it legally in real estate deals. There was no dispute about how much money that was made. It was about $23 million. There was no dispute about how much was owed, that the government claimed was owed in taxes. It was about $2.7 million. Therefore, if you look at... There's a Sixth Circuit case, Jackson-Randolph, that discusses this at length. Why do you look at me when you say Sixth Circuit? Well, I just... It was only a coincidence. Nonetheless, there is a case that very clearly points out that evidence of wealth is not relevant if there's no question about where the money came from and if it doesn't establish the motive. This couldn't have been the motive. The expenditures couldn't have been the motive because they had way, way more than enough money to buy all this stuff, even if there wasn't any... even if they paid every dime in taxes. Well, it's settled law, is it not, that expenditures that are far in excess of reported income, that's relevant evidence of tax evasion. No, that's not... The evidence of disparity is not relevant? The question is, in this tax case, how much money did you make and how much did you owe? The income is totally relevant, but what you spend it on isn't relevant. Because, for example, if the defendant, if Mr. Bontrager had been a saint and given every cent of his money to the little sisters of the poor, he'd still be just as guilty of tax evasion. It doesn't matter what you spend the money on. I mean, it's an interesting argument, but courts have rejected that, right? I mean, Rothschild from the First Circuit, we cannot say that where a taxpayer is living at a level that could appear too high for one receiving income in the amount reported, the government may not point to this in arguing that the taxpayer must have realized that the reported income was too low. Hughes from the Fifth Circuit, the willfulness element of tax evasion can be demonstrated by expenditures in excess of what's reported. But the point in those cases is, I think if you look at those cases, those are cases where the person is spending a lot of money and you can't figure out where's the guy getting all this money from? Like if you're a drug dealer and you report an income of $80,000 a year... So you're saying the difference here in your case is that the amount of income is not disputed. Absolutely. And so there wasn't a need to put in all this excessive evidence of lavish spending, but to prejudice the jury. That's exactly my argument. That's exactly my argument. I understand your argument. Now, I should have asked you at the outset how you're splitting time. I'm assuming it's fairly evenly. Yes, and I think I've already exceeded my times, including my rebuttal, so... Well, let's give Mr. Saunders a chance. Good morning. My name is Jason Saunders. I'm Gordon Saunders, and I represent Mr. Bontrager. I raised ten issues of misconduct. I'd like to focus just on vouching as well as the appeal to the passions of the jury. I agree with you that some vouching occurred in this case. Where's the prejudice, given that you didn't preserve the argument by objecting at trial? If it's so obvious, you should have stood up. Did you try the case, by the way? No, none of the parties here tried the case below. It surprised me that no one objected as well, and I have no answer for why they didn't object to any of the misconduct that occurred because it seemed to happen a lot, and I have no answer for why the judge didn't step in at one point and say, stop, you're going too far. But it didn't happen, and we do have to go under the plain error standard. Evidence, particularly with regard to your client, was pretty compelling. It was compelling, but you also have to look at what the prosecutor did from the beginning of trial all the way through closing. The plan was to taint the jury's bias against Mr. Bontrager by bringing this lavish lifestyle, this opulent lifestyle that no one else could afford, and talking about that as the focus and showing the slides of the pictures you have in front of you and then moving into vouching. I mean, if you look especially to the passions of the jury when they're talking about the federal agents being somewhat patriotic heroes who kind of leap and start fighting for the country to protect our schools and to protect our country, that kind of patriotic hero, they're also saying at the same time, Mr. Bontrager is that kind of louse who just feeds off the nation and doesn't pay his taxes, and he wouldn't care if there was a war or not. In fact, he's going to cause a war because now there's no money. You have to convict him. So these are very egregious comments made by the prosecutor, and the fact that they occurred all the way through trial, and in closing arguments, especially in the rebuttal argument, it was almost the entire rebuttal argument was vouching passions, appealing to the passions of the jury or some other kind of misconduct. Well, in fairness, there was other comment in the rebuttal directed toward comments. You know, Mr. Morgan is a champion of citing how many pages cited to each one, but I will say that it was a very short amount of time designated to evidence, and most of it was based on improper conduct, so much so that I do believe that the combination of these things and how it was planned, it was pervasive, persistent, and it was prejudicial to my client that he never had a chance for a fair trial because it was throughout the trial. It was throughout rebuttal argument, and there was no chance for defense to come in after rebuttal argument. Well, most of the prosecutorial misconduct instances identified were in connection with argument. Is that fair to say? Well, he also called Mr. Bontrager. He said he called every single one of his witnesses a liar, and that's just not true. So it does talk about Mr. Bontrager's testimony. So some vouching, a little bit of arguing outside the evidence, making up conversations that didn't occur, for example. But I've got to say, you've got a tough case because you're on plain error review, and it's a case where your client did testify. Let's talk about just the vouching by itself. When a prosecutor lies to a jury and says something like, Mr. Bontrager, you heard him. He called every single one of my witnesses a liar. He starts that off by saying you should dislike him. This man is a pathological liar. He's calling every single witness a liar and then goes ahead and puts his hand on his shoulder figuratively by saying this witness is honest. He's an honest man, and some of it is not even close. What have you done to make the credibility of the witnesses that the prosecution vouched for a real issue? So I agree that there was vouching that was improper, but I'm not sure how it made a difference given that I'm not sure those witnesses' credibility was really challenged anyway by your side. I don't think they were challenged, but that's certainly what the prosecutor wanted to lead the jury to believe, that they were calling everybody liars and fabricating charts and doing things that were improper just to create that bias. Wait, I didn't understand that. The prosecutor wasn't saying that their own witnesses were fabricating things. No, he's saying that Mr. Bontrager came up with this story, that they were all fabricating charts and stories. But the credibility of the witnesses by itself, that's for the jury to decide. They are the sole province of jury of credibility. So when you take that away, when you taint it to such a severe point— But there are cases about vouching that say it is especially prejudicial when that witness' credibility has been drawn into question, and I didn't see anything that you had done or your side had done to say that those witnesses were inconsistent or had a motive to lie or anything. I do talk about it. I talk about it a lot in my reply brief when it talks about the assumptions that are made by Sandy Bowman. It goes on for page after page. Wasn't that an assumption when you put this— Right, you said they're assumptions, but you didn't show why they're false assumptions. I mean, yes, she did this whole analysis, but I didn't see anything in your brief that said she made an assumption that, here, this shows you that it was a false assumption. I didn't see anything like that. Well, I mean, we're talking about credibility of two witnesses. We had Winston Bontrager testifying this is what they really were. I didn't own this property. This was Pauline's property versus Sandy Bowman saying, no, they were all his, and the assumptions were all based on one side of the story compared to the other. The main character that was against Mr. Bontrager was Sandy Bowman, and that was the fight, the credibility fight between those two people, who are you going to believe, and that's why the vouching is so important because it really did rely on Sandy Bowman. Sandy Bowman was the one who—he talks about four agents, but he's really talking about the charts and everything else, that these are upstanding citizens doing their job and protecting the country. So it goes straight to the most crucial witness in this case, which is Sandy Bowman. Are there any other questions? You're out of time. Thank you. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Michael Morgan. I represent the United States in this matter. As the Court has recognized, every claim alleging prosecutorial misconduct is here on plain error review, and it is patent that they have not preserved their argument that there was any prejudice. You were not the trial counsel in this case, right? It was tried by two other AUSAs? That is correct. And does your office have a practice that the trial lawyers come and argue the appeal before the Ninth Circuit? As a factual matter, one of the AUSAs has retired, and the other has moved to private practice. So that's why— That's why you're here. That's why I'm here. But I do think it is critical that if you're going to make an argument on plain error review, you've got to marshal the evidence and give the Court something, some way to understand the case. You can't take a 2,100-page trial, give three paragraphs of, I was convicted, and expect the Court to sort through all that and figure out— Well, they did a lot more than that. I think that there were numerous errors in this case, particularly in argument, and I would have appreciated concession on the government's part that, in fact, vouching did occur. Well— But the government's brief is just, there's nothing wrong here. We didn't do anything wrong. There was no errors at all, and I just find that very puzzling. Well, Your Honor, I think that, especially in considering the vouching complaints, context matters. And this idea that the credibility of these witnesses wasn't called into question is just false. Mr. Bontrager took the witness stand and flat-out said that what these witnesses said didn't happen. I mean, one of the witnesses who we were accused of vouching for, Mr. Kepfer, was the banker, who recounted a statement where Mr. Bontrager flatly said, I've got this money in these offshore bank accounts in my girlfriend's name because I'm hiding it from the IRS. Mr. Bontrager says, that's ridiculous. And he says that on direct. I mean, so that's calling him a liar, whether or not you use the term. I don't think that, you know, when the defense attacks the strength of the government's evidence, that that then opens up the door for the prosecutor to say, well, he's calling all of my witnesses liars. The agents were a bunch of jackbooted thugs who wanted nothing more than to make up evidence and to show up in the middle of the night, scoop up innocent people. They wouldn't do that. They're upstanding, well-trained, competent professionals, and so they spring into action when they see that somebody is not doing their fair share. I don't think any of that is proper argument. Well, the jackbooted thugs was, in fact, responsive, I do believe, to an argument made by Ms. Anderson's counsel, where she says her home was invaded by a swarm of federal agents who poured through her papers. She's raising this specter of just being persecuted by these agents. And, I mean, jackbooted thugs, yes, that's a vivid reference. But it's not much different than an army of federal agents invading my home. I mean, so it is responsive. Whether or not, you know, should I, would I have gone further? No. But I do think it's responsive to the argument that, essentially, this case was ginned up. And I do think that was a key focus of the defense's argument. Was there a dispute at trial that the defendants made a lot of money, in the order of $23-plus million? Was that a genuine disputed issue at trial? The amount of money they made was not a dispute. Whose money it was, and how they earned it, and how they reported it certainly was. And so, I mean, no, there was no dispute about the raw numbers. There was a big dispute about the import of those numbers. I mean, that was two days of Mr. Bontrager's testimony, trying to explain away all this as just perfectly legitimate business dealings that were accurately reported on my taxes, and there was nothing wrong here. That was what Mr. Bontrager testified to. And that's why I say that when the prosecutor stands up and says, Mr. Bontrager has essentially, and he says basically, he says basically accused them all of being liars. That's fair comment. That's a fair summary of what Mr. Bontrager's trial testimony was. Every witness who attributed some piece of incriminating evidence to him, some incriminating admission, it never happened. Never happened. You do concede, however, that the word liar or fabrication was never actually used, perhaps once. No, that's true. But he certainly implied it, and I think it's fair argument. If someone's going to, they're not going to call you a liar, but label your testimony ridiculous, say that what you say happened never happened. Let me, I'm sorry to interrupt, let me see if I can get you to concede something. Will you concede there was some improper vouching here? Forget a moment about whether you would have said it that way or not. As you look at this, since you weren't in the trial court, would you not concede there was some improper vouching, and you would not use this as an example for AUSAs to follow? I will concede that I will, I would not use this as an example, and I will also concede that the prosecutor definitely tacked close to the wind. I don't think he, I mean. And let me follow up on that. Did the AUSA carry on too long and too often about the lavish lifestyle of the defendants to the point where it seriously affected the fairness of the trial? Absolutely not. Absolutely not. The references to their lifestyle, and this is all we're talking about in the opening statement. It's a minuscule part of the opening statement, and as the court has recognized, this evidence was relevant. And it's relevant to more than just the tax charges. And that's an important point, because while Your Honor points out that there's no dispute about the money, there's a big dispute about whether or not the disclosures and the tax filings are willful. And this evidence of disparity is powerful, prohibitive evidence of the willfulness of their evasion. And that was a key focus of their defense. This evidence was also directly relevant as substantive proof of the conspiracy and the steps taken to evade, and as to Mr. Bontrager, substantive proof of all the false statements charges that he's denying. You know, I don't own any cars. Well, what about these two cars? I don't own any homes. What about these two homes? I agree with you that some lifestyle evidence is relevant in this case, but I think that when you focus so much of the trial on the lavish lifestyle, you have to be, as an AUSA, really careful and really understand where the line is appropriately drawn within the body of case law that's not only within the Ninth Circuit but across the country as well. So when you say to the jurors, she's got more shoes than Imelda Marcos, look at all these gorgeous, fancy shoes. They're living the lifestyle that most of us can only dream of and make that a recurring theme from opening through closing. You've crossed the line. And so that's really my point. I understand that we're here on plain error review, but I think the errors that occurred multiple times during the trial, during argument, were fairly obvious, and I would have expected your office to have conceded some of that error. What relevance does it have to ask the jurors to imagine that this lavish lifestyle is more than most of us can ever dream of? That's not lifestyle evidence. I think that's appealing to the passion and prejudices of the jury. Don't you? Not in context. I would agree that when you take little snippets of the prosecutor's opening and you just sort of line them up together, it looks bad. I'm not going to deny that. But when you look at the context in opening, when the prosecutor says you're living a lifestyle you and I can only dream, and he immediately goes to say, but they're not on trial here because they're wealthy. We're not prosecuting them because they're wealthy. We're prosecuting because they didn't pay their taxes. And the reason why this evidence is you're going to hear about it is because you're going to see how much they declared an income and how they were living, and you're going to see this incredible disconnect, and that's evidence of willfulness. I don't think that AUSAs can insulate improper comments by saying, well, but I tied it in to some issue that's relevant during the course of the trial. I'm sure you're familiar with the very often-repeated phrase that the prosecutors permitted to strike hard blows but not foul ones, and there were foul ones in this case. Now we have to decide whether the evidence was so overwhelming that on plain error review it doesn't warrant reversal, but there were certainly foul blows stricken in this case. Well, I guess to that point, Your Honor, I would like the chance to convince you otherwise, and if you would point me to the specific instances that you feel were, because I do feel that some of these things that have been identified were proper. Some were a lot closer to the line than others. There's a cumulative nature of it. I mean, why talk about the gold ceiling and the Meldon Marcos amount of shoes and the multiple homes, the Rolls Royce? I mean, at some point you've made the point that they have a lot of money and they're not reporting it, right? Why did this go on for six weeks of more and more and more of it? Well, respectfully, Your Honor, it didn't go on for 16 days. It didn't go on for that long. In fact, the substantive evidence of the lifestyle, I think if I counted it right, is 177 pages of 2,100 pages of the government's testimony, a drop in the bucket, a drop in the bucket. The majority of the testimony is devoted to unraveling of these Byzantine transactions and to show how this money was generated, how it was falsely reported, and all the various false statements that were made to the various people, the various tax professionals, to accomplish this scheme. That's the government's case. The evidence of the lifestyle stuff was small and relevant, and as I say, in this case... But, I mean, you just said it's 177 pages of lifestyle stuff. Isn't that more than you need to make the relevant point? Again, as an example, when you talk about two homes, well, evidence of those two homes is necessary because they're both being titled in Ms. Anderson's name. Okay, so maybe you say they're homes and you say the number of square feet, but you don't have to talk about the gold ceiling. It went beyond what was needed to show that they're lying. Perhaps, but again, I think, objectively speaking, it's a small part of the case. It's a small part of the case. And when you add that, though, to the vouching and some flat-out misstatements by the U.S. Attorney, an argument with respect to, for example, well, we can argue about the lying, but also in closing, when he compares Pauline Anderson to Tamara DeGrosse, contradicting the very cautionary jury instruction that was given by the court to the jury when he argues they were two peas in a pod, and they clearly were not two peas in a pod. In other words, it's a cumulative effect. It's not just the lavish lifestyle. It's the other stuff also. Well, respectfully, to that point, they were two peas in a pod. The point of that is not to show that we're not arguing the 404B evidence is relevant proof of Ms. Anderson's intent or motive. That would be irrational because she wasn't on the scene at that time. The point is they play the same role in two different schemes. So they are two peas in the pod, and I think that's a fair argument. I don't think that statement crosses the line. But I do think, circling back, obviously I'm not going to convince the court that every statement that the prosecutors made in this case was proper, but on plenary review, you've just got to show prejudice. And on this record, the defendants cannot. As to Mr. Bontrager, I think the calling the proof compelling is understatement. This is overwhelming against Mr. Bontrager to the nth degree. There is no dispute about the evidence against Mr. Bontrager. Ms. Anderson as well. She's in depositions lying about the structure of these companies and who owns what to keep the scheme going when Mr. Snook's lawyers have discovered that he's been rooked in the first transaction. Nobody does that if they're not an active participant in the scheme. This idea that the case against Ms. Anderson is built on the evidence found in their home is just fantasy. So I think on plenary review, they've got a tough row to hoe, and as the government would point out, they've actually forfeited the claim. Neither defendant has even tried to marshal the evidence for this court. And that's just their obligation. It's their obligation to do it for the court. They haven't, so they forfeited review. If the court has no further questions. I'd ask one question since we have a moment. Are you going to defend what I consider vouching for the federal agents Lopez, Hergert, and Bowman? The reply brief on pages 6 through 8 discusses that. Would you agree with me on this point as well, that it's improper comment about the search warrant, about the judge? That's out of line. There was no evidence of that, and it was improper to discuss that in front of the jury. Again, I think there was evidence of that, and I would also point out that this was A, interjected by the defense. Ms. Anderson discussed the subpoenas, the grand jury subpoenas, and the search warrant. There was testimony about the search, and there was testimony about grand jury subpoenas, so it had a record basis. Now, so I don't think we're arguing outside the record. If the court's point is that, you know, this was, you didn't need this much to attack, I will take the court's point on that. We just can't get you to concede a single thing today, can we? I did defend them in my brief. The government would have been much better off in this case conceding that some error occurred and then arguing harmlessness. So I think it would be worthwhile, given that this was a three-week trial, I'm assuming a pretty big trial within the office, to pull some of these comments and use it as a training tool when you're arguing as AUSAs in the trial. You didn't need it. Your point is taken. All right, thank you. Thank you, Your Honor. Let's put a minute on the clock for rebuttal. I'll give your side the last word. Yes, thank you. I have two points to make. First, to argue that the evidence of lavish living was minuscule, it's kind of like saying that the Sermon on the Mount is just a small part of the Bible, so it's not important. I mean, it's ridiculous when you look at that opening statement alone to say that that was not the focus of the opening statement. I would just encourage the Court to read if you have any doubts about that. Second is to the plain error point. My opening brief discusses, it's on pages, I think, four through nine, it discusses the government's theory of the case against Ms. Anderson, discusses the proof of it, and it discusses her defense. My reply brief also discusses why the evidence was weak and why it was prejudicial. So I do not think the claim was waived in any respect. And I would just say overall that it is a plain error case, but it's a case in which there are a vast number of errors, and it's a case in which my client, there was very little evidence. When Mr. Morgan says it's a fantasy that the best evidence against Ms. Anderson was in that bag that found in her apartment, that's not my fantasy. That's what the prosecutor said in the closing argument. He said that's the best evidence against her. If that's the best evidence against her, that means it's a very weak case. And in view of the enormous amount of prejudicial evidence that came in and the enormous amount of blatant prosecutorial misconduct, that's why Ms. Anderson should get a reversal on this case. We've got it. Thank you. Thank you. All right. The matter is submitted for decision. I thank both sides for your argument in this case.
judges: Zouhary, Nguyen, Friedland